UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

Reign J. Kechene,
        Plaintiff

v.

4:20 CV 559 WS-MAF

Civil Action No. _____

COMPLAINT

Mark S. Inch,
Member of FDOC Legal Department,
Member of FDOC Gender Dysphoria Review Team,
    Michelle Schouest, Secretary's Designee
    T. Bowden, Secretary's Designee
    E. Hand, Medical Director of Wakulla CI Annex
    J. Coker, Warden of Wakulla CI Annex
    Col Tanner, Correctional Officer at Florida State Prison
    RN Jarrod, Nurse at Florida State Prison
    G. Espino, Medical Director of Florida State Prison
    AW McLellan, Assistant Warden of Florida State Prison
    Warden Palmer, Warden of Florida State Prison
    Sgt Todd, Correctional Sergeant at Wakulla CI Annex
    Marchant, Classification Department Head at Wakulla CI Annex
    Lt. Olds, Treatment at Wakulla CI Annex
    AW Dix, Assistant Warden at Wakulla CI Annex
    Col Noles, Colonel at Wakulla CI Annex
    SCO Gould, State Classification Officer at Wakulla CI Annex
    Howard E. Tinker III, Colonel at Zephyrhills CI
    Tamera Poynter, Warden of Zephyrhills CI
each individually and in their official capacity,
        Defendants

I. Jurisdiction and Venue

1.   This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States of America.

FILED USDC FLND TL
DEC 7 '20 AM 11:12

The court has jurisdiction under 28 USC Section 1331 and 1343 (a)(3). Plaintiff seeks declaratory relief pursuant to 28 USC Section 2201 and 2202. Plaintiff's claims for injunctive relief are authorized by 28 USC Section 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2.      The Northern District of Florida is an appropriate venue under 28 USC Section 1391(b)(2), because it is the location in which most of the events occurred, and the location from which the actions of top officials of the Florida Department of Corrections originate.

## II. Plaintiff

3.      Plaintiff  Reiyn J. Keohane is a transsexual female who at all times mentioned herein has been a prisoner of the State of Florida in the custody of the Florida Department of Corrections. She is currently confined at Florida State Prison in Raiford, Florida.

## III. Defendants

4.      Mark S. Inch, defendant, is the Secretary of the Florida Department of Corrections. He is legally responsible for the overall operation of the Department, its state-wide policies, and each institution under its jurisdiction.

5.      Members of the Florida Department of Corrections Legal Department, defendants, are a party to this suit. They are legally responsible for drafting and publishing, as well as the enforcement across institutions of, state-wide policies of the Florida Department of Corrections.

6.      Members of the Florida Department of Correction Gender Dysphoria Review Team, defendants, are a party to this suit. They are legally responsible for enforcing policy state-wide that refers specifically to the placement and treatment of 'Transgender and Intersex' inmates across the entire Florida Department of Corrections.

7.      Michelle Schuvest, defendant, is one of the Secretary's Designees. She is legally responsible for the actions taken in the role of Secretary's Designee, in responding to grievances originating at any institution in the Florida Department of Corrections.

8.      T. Bowden, defendant, is one of the Secretary's Designees. They are legally responsible for the actions taken in the role of Secretary's Designee, in responding to grievances originating at any institution in the Florida Department of Corrections.

9.      E. Hand, defendant, is the Medical Director of Wakulla Correctional Institute Annex. He is legally responsible for overseeing all medical care provided at that institution, as well as for the decisions made about treatment taken during the course of his duties.

10.  J. Coker, defendant, is the Warden of Wakulla Correctional Institute Annex. He is legally responsible for the operation of Wakulla CI Annex and the supervision of all staff employed there, as well as for the welfare of all inmates housed at that institution.

11.  Correctional Officer Tanner, defendant, is a correctional officer at Florida State Prison. He is legally responsible for actions taken during the course of his duties as a Correctional Officer of the State of Florida Department of Corrections. At all times mentioned in this complaint he held the rank of correctional officer one (1) and was assigned to Florida State Prison.

12.  Nurse Jarrod, defendant, is a Registered Nurse at Florida State Prison. She is legally responsible for delivering medical care to inmates at that institution and for actions taken during the course of her duties.

13.  G. Espino, defendant, is the Medical Director of Florida State Prison. They are legally responsible for overseeing all medical care provided at that institution, as well as the decisions made about treatment taken during the course of their duties.

14.  Assistant Warden McLellan, defendant, is an Assistant Warden at Florida State Prison. They are legally responsible for actions taken during the course of their duties, including the decisions made in response to grievances as the Warden's Designee.

15.  Warden Palmer, defendant, is the Warden of Florida State Prison. He is legally responsible for the operation of Florida State Prison and the supervision of all staff employed there, as well as for the welfare of all inmates at that institution.

16.  Sergeant Todd, defendant, is a correctional officer at Wakulla CI Annex. He is legally responsible for actions taken during the course of his duties as a Correctional Officer of the State of Florida Department of Corrections. At all times mentioned in this complaint he held the rank of Sergeant and was assigned to ~~Florida State Prison~~ Wakulla Correctional Institute Annex.

17.  Classification Officer Merchant, defendant, is the Department Head of Classification at Wakulla CI Annex. She is legally responsible for overseeing all housing and work assignments and the entire classification department of that institution, as well as for decisions made during the course of those duties.

18.  Lieutenant Olds, defendant, is a correctional officer at Wakulla CI Annex. He is legally responsible for actions taken during the course of his duties as a Correctional Officer of the State of Florida Department of Corrections. At all times mentioned in this complaint he held the rank of Lieutenant and was assigned to Wakulla Correctional Institute Annex.

19.  Assistant Warden Dix, defendant, is an Assistant Warden at Wakulla CI Annex. He is legally responsible for actions taken during the course of his duties, including the decisions made as part of the Institutional Classification Team.

20.  Colonel Notes, defendant, is the Colonel of Wakulla CI Annex. He is legally responsible for all actions taken during the course of his duties as the head of security for that institution, as

well as as part of the Institutional Classification Team, and for the supervision of all correctional officers assigned to Wakulla Correctional Institute Annex.

21.     State Classification Officer Gould, defendant, is the State Classification Officer assigned over Wakulla CI Annex. He is legally responsible for actions taken during the course of his duties.

22.     Howard E. Tucker III, defendant, is the colonel at Zephyrhills CI. He is legally responsible for all actions taken during the course of his duties as the head of security for that institution; as well as the supervision of all correctional officers assigned to Zephyrhills Correctional Institute.

23.     Tammen Poynter, defendant, is the Warden of Zephyrhills CI. She is legally responsible for the operation of Zephyrhills Correctional Institute and the supervision of all staff employed there, as well as for the welfare of all inmates housed at that institution.

24.     Each defendant is sued individually and in their official capacity. At all times mentioned in this complaint each defendant acted under the color of state law.

## IV.  Facts

25.     Plaintiff, Reign J. Keohane, alleges in this suit, that the Florida Department of Corrections has acted with deliberate indifference to her serious medical need for Sexual Reassignment Surgery, which has resulted in a pattern of abuse due to her placement in unsafe conditions in male institutions solely based upon the external appearance of her genitalia, and repeated malicious abuse by staff based solely upon that placement.

A.  Deliberate Indifference to a Serious Medical Need for Sexual Reassignment Surgery

26.     Plaintiff, Reign J. Keohane, is a transsexual female diagnosed with Gender Dysphoria currently in the custody of the Florida Department of Corrections.

27.     The FDOC admits that Gender Dysphoria is a serious medical need.

28.     Plaintiff is currently prescribed Hormone Replacement Therapy and social transition to treat her Gender Dysphoria. She is also provided with counseling.

29.     Despite these treatments, plaintiff continues to suffer severe impairment of her ability to function on a day to day basis, due to the severe depression and anxiety she experiences as a result of the dysphoria.

30.     At all opportunities plaintiff has informed mental and medical healthcare staff that she believes her treatment is inadequate; as it has not alleviated the symptoms in any meaningful way, she still experiences severe depression and suicidal ideation on a daily basis, as well as sickness

and revulsion at the current state of her body.

31.     This depression has been diagnosed as Persistent Depressive Disorder.

32.     Plaintiff's depression has two main factors: the first is the constant feelings of sickness and revulsion due to the state of her body. This is at its worst when forced to experience the physical sensation of her body, such as when using the bathroom, showering, changing clothes, and so on.

33.     The other factor is that the current state of her body is used as an excuse to harass, abuse, and degrade her by others. The full extent of these abuses are detailed under Section B of this Complaint.

34.     Plaintiff has been diagnosed with Post-Traumatic Stress Disorder due to these abuses.

35.     Established medical standards used by the American Psychiatric Association and others state that Post-Traumatic Stress Disorder cannot effectively be treated until the patient has been removed from the dangerous environment to one that's safe and has remained there for some time. As all male institutions have been dangerous environments to plaintiff, she is unable to have this PTSD treated while housed in one.

36.     This comorbid factor, of untreatable PTSD, is causing Plaintiff's mental health to consistently degrade over time and is the element that poses the greatest risk to her health, and her life, as every one of her suicide attempts has immediately followed an event that's abusive in nature.

37.     These abusive events cause plaintiff to feel hopeless, as they have consistently occurred at every institution she has been housed at, and so long as she remains housed in male facilities these events will continue for the forseeable future; further, she has a genuine fear for her life because it is possible one of these events could cause her permanent injury or death.

38.     Plaintiff has been informed by the former PREA (Prison Rape Elimination Act) Coordinator for the Florida Department of Corrections, in official testimony as well as face-to-face conversation, that her placement in male institutions is based solely on the external appearance of her genitalia.

39.     This former PREA Coordinator, Kendra Prik, also testified that an inmate with both male and female sex characteristics, who has an under developed penis that is non functional, and is sterile, can qualify to be housed in a female facility.

40.     FDOC Security department heads and experts testified that there was no major risk in housing such a person in a female facility; they also testified that the amount of violence and sexual abuse in female institutions is significantly lower than in male institutions.

41.     Plaintiff, Reign I, Keohane, medically qualifies to be housed in a female institution pursuant to this policy, and has qualified for placement in a female facility at all times described in this complaint. She has been refused placement in a female facility and kept in male facilities instead,

42.     FDOC officials have claimed that housing Plaintiff in a female institution, despite the medical facts, constitutes a security risk due to the external appearance of her genitalia. However, they also have admitted that having plaintiff in a male institution also puts her at severe risk of violence and sexual abuse.

43.     This dilemma is entirely of the FDOC's own making. Plaintiff does not want to be housed in a female facility simply as she is; she has repeatedly stressed that she requires Sexual Reassignment Surgery to all Medical and Mental Health Staff she has talked to.

44.     Plaintiff has never been evaluated for Sexual Reassignment Surgery, nor has any determination been made to its medical necessity. Nevertheless, all plaintiff's requests have been unanswered or denied; she has grieved and fully exhausted these denials.

45.     No medical reason has ever been stated for the denial of Sexual Reassignment Surgery that plaintiff is aware of.

46.     Plaintiff has also requested leave to contract for her own outside medical care multiple times, in accordance with FDOC medical policy. These requests have also been ignored or denied; again for no medical reason plaintiff is aware of.

47.     Plaintiff also spoke to one Dr. Zayas, an endocrinologist contracted by the FDOC to provide for plaintiff's medical care and Hormone Replacement Therapy.

48.     In November 2019, Dr. Zayas personally informed plaintiff in a video conference call that she would write plaintiff a referral for Sexual Reassignment Surgery, as she believed it to be medically necessary for plaintiff's care.

49.     At the same time, Dr. Zayas also wrote a prescription for a change in medication and for a facial-hair-suppressant product, which she also stated she believed were medically necessary.

50.     Plaintiff spoke to Dr. Shawn Lloyd, the Mental Health Director, of Wakulla CI Annex, and leader of its Gender Dysphoria evaluation program, about these issues, and the referral by Dr. Zayas. Dr. Lloyd personally stated to plaintiff he would support the referral and check her medical records regarding its status.

51.     Dr. Lloyd later informed plaintiff he could not find the referral in plaintiff's medical records, or the copy of the specific email, which he stated would have been sent to the healthcare provider's main offices in Tallahassee. He did inform plaintiff that the medical records had the new prescriptions, but that the facial hair suppressant had been 'disapproved' by central office, with no medical reason given as to why.

52.     Plaintiff has no reason to believe that Dr. Zayas lied about writing the referral, especially when the other aspects of the email were noted exactly as Dr. Zayas had said.

53.     The FDOC maintains that Dr. Zayas made no such referral.

54.   Plaintiff grieved the lack of response following the referral incident, and was denied. She appealed, and was denied. Both denials offer no medical reason as to the denial. These are the only grievances mentioned in the complaint plaintiff currently has copies **of** (attached at Exhibit A), but all others should be easily obtained through the discovery process.

55.   This denial perpetuates the cycle of abuse by eliminating the one sure method by which plaintiff's medical care, and personal safety, can be provided for, as the FDOC admits that if plaintiff received Sexual Reassignment Surgery she would have to be assigned to a female institution.

56.   Plaintiff described the risks to her health and life due to the denial of this treatment, and thereby all signants to the denials are personally informed of and responsible for the harms caused by denying this care for non-medical reasons.

57.   Michelle Schonest, T. Bowden, J. Coker, and E. Hand are all signatories to the denials included as Exhibit A.

58.   Plaintiff also grieved the denial of dedicated hair-removal treatment. Plaintiff is able, at times, to provide for this care herself by using a personal electric razor, but FDOC policy permits security to confiscate said razors at certain levels of housing and confinement which causes a risk of this care being denied her by nonmedical staff so long as it is not medically prescribed or given in a manner that results in permanent hair removal.


          B.  'A Pattern of Abuse due to her placement in unsafe conditions ... and repeated malicious abuse by staff based solely upon that placement'


59.   This section is divided into two parts: Section 1 describes unlawful elements, of physical and sexual abuse, and of the deliberate indifference of FDOC staff which has exposed plaintiff to the unreasonable risk of serious harm, and actual injury. Section 2 describes abuse committed directly by FDOC staff against plaintiff under the guise of FDOC policy, written and unwritten, about treatment of inmates assigned to male institutions.


          1. Unsafe Conditions and Unlawful Actions


60.   Since being remanded to the custody of the Florida Department of Corrections in July 2014, plaintiff has been housed solely in male institutions.

61.   Plaintiff has experienced violence and sexual abuse from male inmates at every single institution she has been housed at, both prior to and following her represcription of Hormone Replacement Therapy and social transition in September 2016 and August 2018 respectively.

62. In chronological order, plaintiff has been housed at South Florida Reception Center, DeSoto CI, Charlotte CI, Dade CI (with a leave of about 10 months to outside court), Everglades CI, South Florida Reception Center, Jefferson CI, Zephyrhills CI, Walton CI, Santa Rosa CI, Walton CI, Wakulla CI Annex, and Florida State Prison.

63. In her very first hours at South Florida Reception Center, during intake, an unknown Correctional Sergeant slapped plaintiff across the face for no stated reason.

64. While housed in B dormitory at South Florida Reception Center, an inmate whose last name Plaintiff recalls as Washington attacked plaintiff and attempted to steal stamped envelopes from her. Plaintiff informed staff and was placed in confinement pending protective management.

65. While housed in E dormitory at SFRC, inmate 'Washington' ordered plaintiff's roommate to attack her. The roommate waited until she was asleep and hit her with a sock filled with soap.

66. Another roommate in the same dormitory committed lewd and lascivious masturbation directed at her, then grabbed and fought her when she told him to stop.

67. Another roommate, immediately upon seeing plaintiff, threatened to kill her with a knife he had concealed in his property, and told staff he was going to kill her if he was not moved out of the room; he was moved to a different cell.

68. At DeSoto CI Annex, plaintiff was housed in M Dormitory bunk number 1204 single. The inmate in bunk 1205 lower committed lewd and lascivious masturbation directed at her.

69. Another inmate at DeSoto CI Annex, in M dormitory, who plaintiff recalls as being named 'Bruce K.', forcefully stuck his hand down plaintiff's pants while high on synthetic cannabis.

70. Plaintiff attempted auto-orchiectomy in January 2015 at DeSoto CI Annex, and was transferred to the Crisis Stabilization Unit at Charlotte CI.

71. During the first 24 hours at Charlotte CI, the sprinkler in plaintiff's cell malfunctioned and went off on its own; plaintiff was extracted from the cell and placed in a shower, where an unknown treatment slapped and punched her in the face, saying she was a liar because she said she didn't do anything to the sprinkler and didn't know what happened to it.

72. While housed in C dormitory (the CSU dormitory) at Charlotte CI, an inmate who gave his name as 'Rall Mall' committed lewd and lascivious masturbation directed at plaintiff, both by standing on the sink in his cell so he could look into and expose himself to plaintiff while she was in her cell, and doing the same when she came out of the cell for showers and programs.

73. Plaintiff told correctional staff about the inmate, but was ignored and told unless it was on camera there was nothing they could do to stop him.

74. Plaintiff was transferred to the Transitional Care Unit at Dade CI; shortly thereafter she was transported to Charlotte County Jail pending outside charges for the alleged destruction of the sprinkler.

75. Plaintiff was found Not Guilty at trial of the 'sprinkler charge' and returned to Dade CI, J Dormitory, the Transitional Care Unit.

76. There she was placed into an SHOS cell and told that, because she had gone to outside court, she had to go through the entire program again from the lowest level, despite the fact that she had been near to release to general population before going to court.

77. While in the SHOS cell, an inmate across the way stood on his sink, committing lewd and lascivious masturbation directed at her. She spoke to the psychologist about this but was told there was nothing they could do.

78. While in J5 dormitory, an inmate with a prosthetic leg told plaintiff he was going to rape her, and would kill her if she tried to refuse. Fortunately that inmate ended up leaving the dormitory very shortly thereafter.

79. Plaintiff was released from TCU, and transferred to Everglades CI in 2016.

80. Plaintiff was housed in G Dormitory, wing 4, cell 211, and assigned to the upper bunk. For several days Plaintiff had no roommate and was told she was being housed alone because she was transgender, and did not have any problems.

81. Plaintiff had a roommate, inmate Galeana, for about a month, after that and had no issues with him. He was moved to another dorm, and inmate Isiah Darcy was moved into the cell.

82. Darcy claimed to be a gang member and made repeated disparaging comments about 'faggots'; for example one evening he was standing just outside the cell on the walkway, watching the news, when the Pulse Nightclub shooting occurred, and Darcy said "Good, they should kill all those faggots".

83. Plaintiff was afraid of how Darcy would act towards her being transgender the entire time he was assigned to the cell, and avoided spending any time in the cell she did not have to; as she was assigned to Education as an aide and went to many programs she was largely able to avoid interacting with him.

84. One night, for no apparent reason, Darcy punched plaintiff in the solar plexus totally unprovoked. He later said it was for stains on his sheets he had caused himself, with the manner by which he prepared canteen food.

85. Plaintiff was friends and coworkers with an inmate named Richard Pratt at that time, and he had previously spoken to Darcy to try to ease any tensions; he was housed across the dormitory in wing 1 and plaintiff used sign language to ask his advice, as she did not ~~want~~ want to repeat the issues caused by reporting an incident that had occurred early in her incarceration.

86. Pratt suggested that she try to survive through the night without incident and speak directly to the housing sergeant in the morning; plaintiff also had an inmate in the dorm lend her a knife for self-defense.

87. Plaintiff locked down in the cell with Darcy for the night and did not sleep at all due to the

fear; but, there was no repeat incident. She returned the knife to its owner in the morning.

88.    Plaintiff went directly to speak to the housing sergeant that morning, and Darcy was moved to a different dormitory. She was assigned a new roommate, inmate Vaughan, and did not have any problems with him.

89.    Around this time Richard Pratt became more assertive, pushing for a 'more than friends' relationship, and stating that plaintiff was obligated to him for his help in getting a job and with other inmates. He suggested that if she did not agree to be with him, there were other inmates who had told him they wanted to pursue or rape her and it was only the fact that he was assumed to be 'with' her that was stopping them.

90.    Plaintiff was intimidated by this, but more afraid of the risk of violent strangers than of Pratt, and agreed to be in a relationship with him.

91.    That relationship with Pratt was predicated by fear and abusive in its nature from the very beginning; it lasted until around April 2017, after plaintiff was transferred and free of his influence.

92.    Pratt coerced plaintiff to give him oral sex perhaps as many as 100 times, and anal sex 4 times, by threats and stated obligations.

93.    Plaintiff and Pratt argued frequently, largely because plaintiff was unhappy and resentful of the power he exercised over her; only at one point, while plaintiff was housed in G Dorm Cell H109, did Pratt actually use violence against her, by choking her, but he frequently made allusions to and statements about violence, talking about people he had fought or killed; weapons, and thoughts of killing people who annoyed him, which was nearly everybody.

94.    At one point, plaintiff was given a DR (Disciplinary Report) for refusing to get a haircut, and sent to F dormitory. While there, when coming out of her cell to take a shower, an unknown correctional officer body slammed her into the glass wall of the dormitory, and forcibly shaved her head.

95.    Plaintiff was let out of confinement and assigned to E dormitory cell 2203, on the upper bunk, with the roommate Vincent Parmer. At first, Parmer assured her there would be no problems.

96.    That night, after Master Count, when they were locked down in the cell alone, Parmer took a knife from under his mattress and demanded that Plaintiff masturbate him, or he would stab her; plaintiff, fearing for her life, did so.

97.    Plaintiff, fearing for her life, could not sleep at all that night and went immediately to medical in the morning; she declared a Psychological Emergency and wished to speak to her counselor, Sonele Baute.

98.    Plaintiff told Baute everything that occurred, and also stated that she was afraid of being sent back to confinement; or transferred, or attacked for reporting the incident. Baute

told plaintiff not to worry and that she would handle it.

99. That day, Plaintiff was moved back to G dormitory wing H ; plaintiff never heard anything else about the incident from staff.

100. In March 2017, plaintiff was transferred to South Florida Reception Center in transit to Jefferson CI.

101. Despite the fact that plaintiff had purposefully trimmed her hair off of her ears and neck, in order to comply with the existent policy for male inmates, and this haircut was approved of as being within regulation by staff at Everglades CI, the staff at South Florida Reception Center declared her hair was not in regulation and ordered her to get a haircut.

102. Plaintiff was placed in confinement for refusing to get a haircut.

103. While in confinement, plaintiff's hormone medication was 'lost' despite the fact that she had told staff exactly where it was, in her property.

104. Plaintiff hanged herself and had to be cut down by staff. One of these officers punched her in the face and said, "Trying to kill yourself, faggot?"

105. Plaintiff was placed on suicide observation, where she was still refused her medication, because of 'lost paperwork'. By this time she with drawals were making her violently ill, and she attempted to hang herself again.

106. Plaintiff was then released from suicide observation and sent back to confinement, despite the fact that she had not spoken to any psychologist and was clearly still suicidal.

107. While being taken back to E Dormitory, officer B. Jones physically forced plaintiff into a mop closet, held her against the wall with the help of an unknown officer, and shaved her head.

108. B. Jones falsified documents, stating that plaintiff shaved her own head, which is impossible as her hands were cuffed behind her back ; plaintiff also asserts she would never and has never shaved her own head and would rather die than do so.

109. Plaintiff was sent to Reception Medical Center West Unit and remained there over a weekend ; and placed in C Dormitory. During that time she was threatened by other inmates who were unhappy that she was required to shower alone during count, but the dorm officers addressed the problem.

110. Another inmate began to sexually harass her, telling her he wanted to have sex with her. Plaintiff personally witnessed him and his cohorts rob another inmate with a knife ; and she was afraid of him, but brushed him off ; fortunately she was transferred shortly thereafter.

111. At Jefferson CI, in April 2017, plaintiff was placed in A2 Dormitory, which was designated a 55+ / Orderly Dormitory, in order to 'provide for her safety'.

112.     An inmate in that dormitory, Paul Chapman, helped plaintiff get a job in the Education department shortly after she had arrived at Jefferson CI.

113.     Chapman then said plaintiff was obligated to him, but plaintiff insisted she was not going to be more than friends.

114.     During one class, a student began to commit lewd and lascivious masturbation against plaintiff, and Chapman smacked him upside the head, then took him aside and told him never to do that again.

115.     That night, Chapman became pushy during a conversation, and held plaintiff down on his bed, biting her neck and giving her a large hickey.

116.     The next morning, staff noticed the hickey and plaintiff told them Chapman had done it. She was, however, taken aside and interviewed with him and he instructed her to write a statement saying it was consensual; if interviewed separately plaintiff would never have said so, but she was afraid of what he would do if she accused him in his presence.

117.     Chapman was moved to another dorm, but he continued to pursue and stalk plaintiff. He was also removed from Education.

118.     One day, Chapman came to the dorm and was let in by the dorm officer. He was allowed to remain in the dorm the entire day, even until late that night after Master Count, asserting he was still assigned to the dorm.

119.     That night, plaintiff went to use the bathroom before going to sleep. Chapman followed her, cornered her in the bathroom stall, and took a knife from his pants. He told plaintiff that if she did not perform oral sex on him he would stab her; plaintiff was in fear for her life and did.

120.     Chapman was removed back to his dormitory that night, but continued to attempt to come to AR dormitory and the education building, by waiting outside the chow hall and eluding security; he tried to grab plaintiff on the main walkway, in front of other education coaches.

121.     Plaintiff told her supervisor, Robert Majewski, about the issues with Chapman, and he spoke to Assistant Warden Ralph. Chapman was taken to confinement, and transferred shortly after.

122.     Plaintiff returned to Lee County Jail on an appeal in late July 2017; plaintiff notes that while she was there she was housed on the female side of the medical wing, in a single cell, and that she felt safe and comfortable in such a setting. She was able to use the same shower as other female inmates, and communicate with them from a distance, and was not harassed or disrespected by any of them.

123.     Plaintiff returned to Jefferson CI after the appellate proceedings; shortly afterward she was transferred to Zephyrhills CI.

124. While at Zephyrhills CI, plaintiff was sexually harassed and threatened by an inmate whose name she does not recall; she reported the incidents.

125. She also had an inmate come up from behind her and put his hands on her hips; she reported that incident as well.

126. During a use of force incident against her (these are covered in Section 2) a sergeant whose name plaintiff does not recall pulled up plaintiff's shirt and bra with his hand, then groped her breast; she reported this incident.

127. Plaintiff is unaware of any formal PREA procedure that occurred from these reports.

128. Plaintiff is unaware of any formal PREA procedure that occurred from reporting inmates Parmer and Chapman.

129. Plaintiff was transferred to Walton CI and placed in the confinement dormitory there due to arriving at the institution after classification had left for the day.

130. While in confinement, the inmate in the cell directly across the cell block from her moved to the back of his cell and began to commit lewd and lascivious masturbation directed at her.

131. Plaintiff covered the window to her cell and tried to tell confinement staff, but was totally ignored.

132. Plaintiff was already in a precarious mental state due to incidents at Zephyrhills CI, and denials of grievances about those incidents and her medical care, and this event caused her to feel there was no hope of ever surviving in a male institution; She attempted suicide by taking about 90 tylenol (over 30,000 mg).

133. Plaintiff informed staff on the night shift she had taken the pills, and was taken out of her cell to see a nurse; and put in a shower while waiting for the nurse.

134. Several inmates made harassing comments, like, "Show us your tits" and were standing on their doors, looking into the shower for an extended time; plaintiff cannot be certain but believes several of them to have been masturbating while looking at her, as this is a very common problem.

135. Plaintiff spoke to the nurse, who said a tylenol overdose was not a serious problem and told officers to put plaintiff back in her cell. Plaintiff was put back in the cell.

136. Several hours later, plaintiff was unresponsive during master count, and was rushed to the hospital. By that time all the tylenol had been absorbed into her bloodstream, and she remained at the hospital for 4 days for antidote treatment.

137. Plaintiff was returned to Walton CI, but then transferred to Santa Rosa CI Annex shortly thereafter. She was placed in CSU.

138. Shortly thereafter, an inmate, Watson, told plaintiff that when she went to the

shower he was going to masturbate while looking at her. Plaintiff informed staff, and at the same time, described the continued issues and incidents described so far in this complaint, and requested protective management.

139.    Notably, she described the ongoing problems with Richard Pratt. Pratt had stated that if plaintiff ever left him he would kill her, and he knew the address and phone number of her parents.

140.    Chapman also made similar threats, stating that he intended to 'put a hit' on plaintiff because she had refused to be with him.

141.    Plaintiff wrote grievances asking for Protective Management and was denied.

142.    Plaintiff spoke to the Institutional Classification Team at Santa Rosa CI Annex, and was denied.

143.    Plaintiff was released from CSU, and sent to TCU, also at Santa Rosa CI Annex; she was released from TCU and returned to Walton CI.

144.    Plaintiff was housed in G Dorm at Walton CI, in general population. About a month later she was transferred to Wakulla CI Annex, and placed in N Dorm, which is a DTU (Diagnostic and Treatment Unit), a form of less restrictive mental health dorm.

145.    Plaintiff was housed in Wing 2 cell 204; while in her cell an inmate went past her cell to the showers, and stood in the furthest shower, facing her cell and committing lewd and lascivious masturbation. Plaintiff told the dorm sergeant and was moved to wing 1, cell 103.

146.    Somewhat later, an inmate was moved into that wing, who went to the table in the day room and began to commit lewd and lascivious masturbation directed at her, looking into her cell. Plaintiff shouted at him to stop and went and banged on the glass to tell the officers.

147.    The inmate started to threaten Plaintiff and she backed away from him, grabbing a broomstick in case she needed to defend herself before the officers arrived. The Sergeant, Cannon, arrived and told both the inmate and plaintiff to step out into the hall.

148.    Plaintiff told Sergeant Cannon what had happened, but he refused to do anything about it and ordered both the inmate and plaintiff to go back into the dorm and 'don't cause me any more problems'.

149.    Plaintiff spoke to a different sergeant the next day; she reviewed the cameras and said they were inconclusive, and all she could do was move the inmate to a different wing. She moved the inmate and made a report about the incident.

150.    Plaintiff repeatedly asked the mental health staff and dormitory lieutenant to remove her from N dorm, and after about a month she was moved to K dormitory.

151.    Plaintiff was moved from K to J dormitory after repeatedly complaining that she was

unable to shower in K dorm, because the shower has only a waist high wall and is visible from all areas of the bathroom and other parts of the dormitory.

152.    Shortly after being housed in J dormitory, the inmate housed in J3-212 went to the showers across from the cell plaintiff was in and began to commit lewd and lascivious masturbation directed at her. Plaintiff told him to stop and, at her wits' end from the seemingly never ending incidents of this nature, told him she would hit him with a lock if he ever did it again.

153.    He did not do it again.

154.    After a hurricane damaged other institutions, inmates were brought to Wakulla CI Annex from Calhoun CI for emergency housing. One of these inmates was assigned to plaintiff's cell.

155.    Plaintiff told the inmate she was not comfortable with him being in the cell, and they were able to speak to the dorm sergeant to switch him with another inmate, a gay male known to plaintiff who she was more comfortable with and was sure would not try to assault or rape her.

156.    In December 2018, all inmates from J3 dormitory were moved to P3 dormitory, except for a small number. Plaintiff's roommate was not one of the ones moved, and she was immediately assigned a new roommate, inmate Skinner.

157.    Inmate Skinner identifies as gay, but as a 'top', meaning the person in the active position during anal sex, and plaintiff told him she was not comfortable being housed with him. He agreed to be moved to a different cell, but it was several days before he was moved, and it became a point of contention to the degree where plaintiff did not feel comfortable in that cell.

158.    Until the day Skinner was moved, Plaintiff did not lock down in that cell except at Master Count and for the night, and during the night she was unable to sleep at all, and was awake from lockdown until the cells were open in the morning; and then nearly all day until inmate Skinner was moved; in total she could not sleep for approximately 72 hours due to the fear of being locked in a room with an inmate who might assault her.

159.    Plaintiff began to speak to Dr. Lloyd at this time, about these incidents, and he diagnosed her with Post Traumatic Stress Disorder.

160.    Plaintiff has consistantly requested to be housed only with transgender inmates who are personally known to her, and this was largely accepted and followed while she was at Wakulla CI Annex.

161.    After Skinner, her and another transgender female, spoke to the lieutenant over the dorm to ask that that inmate, Pittman, be moved from a cell with a cisgender male inmate where she was uncomfortable. She was moved to plaintiff's cell and both were able to feel safe and comfortable with that housing assignment.

162.    Plaintiff ended up going to confinement for a DR that was dismissed, and when she

returned to P dormitory she was assigned to a cell with a person she did not know," she spoke to the dorm officer and was instead moved to a cell by herself, P3 116.

163.    After being housed in that cell alone for some time, on unknown, cisgender male inmate was assigned to that cell. Plaintiff called her family in severe distress, and asked them to call up to the institution immediately.

164.    They did, and a captain came to speak with her. Understanding her fears about the situation, the captain switched the inmate with a transgender female inmate, Lord, who plaintiff was comfortable with.

165.    The words 'comfortable with', as used by plaintiff in this context, mean 'not afraid of'.

166.    Due to the situation of the cell, P3 116, which backed onto the adjacent dormitory, Q dorm, which housed several long-term mental health patients; plaintiff requested to be moved to a different cell, as the inmates from Q dorm could see into cell P3 116 and some could see directly to the toilet area. She was moved to P3 207.

167.    In January 2020, the head of classification, Mrs. Marchant, ordered all inmates with low housing levels except for a select few to be moved to K dorm. Plaintiff protested immediately as the conditions in K dorm had not changed from when she was housed in it before; if anything, they had gotten worse.

168.    The conditions had gotten worse, in plaintiff's belief, because of an event she was aware of regarding a close friend. That friend had been housed in K dorm and unable to shower or use the bathroom with any privacy, and had been harassed by cisgender male inmates.

169.    At the time, plaintiff had no roommate, and asked an officer capable of doing moves, Mrs. Horton, if she could move the inmate, Ennis, to her own cell to get her out of K dorm. Mrs. Horton said that the colonel, and Marchant, the head of classification, had specifically forbidden that inmate to be moved.

170.    Inmate Ennis ended up being attacked by another inmate with a knife, and only after that was she moved back to P dorm, where she had been housed prior to being moved to K dorm.

171.    Upon being moved to K dorm, another transgender inmate, Wells, who had been moved at the same time, was punched in the face for no apparent reason literally right in front of plaintiff, and in front of the officer station. That inmate, Wells, was taken back to P dorm.

172.    Plaintiff immediately began to protest in every manner she could, that she did not feel safe in K dorm.

173.    Plaintiff spoke directly to Mrs. Marchant, who said, " there is no PREA or security problem with housing you in K dorm" and refused to move plaintiff.

174.    After several days, another inmate, also transgender, approached plaintiff and asked

to shower with her. This inmate had hit on Plaintiff in the past, and Plaintiff said she was not comfortable with that.

175.    The inmate said, "Well, you can't tell me when I can and can't shower," with an attitude, and the statement made Plaintiff concerned about what they would do.

176.    When Plaintiff was preparing to take a shower, someone told her that the other inmate said they were going to just go in there anyway. Plaintiff did not undress but instead left the bathroom, and the other inmate went into it, as they had said.

177.    Plaintiff went and banged on the glass and told the officer in the booth, Jones, to call the captain because she wanted to report a PREA incident. Officer Jones said she would not call anyone and didn't care what happened.

178.    Plaintiff confronted the other inmate, and a fight broke out; several other inmates had to separate Plaintiff and the other inmate. Officer Jones watched the entire fight and didn't come out to stop it or call anyone until it was over.

179.    At that point Plaintiff went and told Officer Jones to go and call the captain right away. A lieutenant came and had both inmates taken to medical to be evaluated.

180.    The next day, the Assistant Warden overrode Merchant's orders and moved Plaintiff back to P dorm, where she was able to shower separately.

181.    In February 2020, inmate Kevin Peterson stole a pair of headphones from Plaintiff. They claimed to be a member of the "Outkast" gang.

182.    Plaintiff confronted the person in an oblique manner, by asking them to "keep an eye out for who took the headphones", and then showed Peterson a knife, borrowed from another inmate.

183.    Peterson told security about the knife, and during a mass search it was found in a public area in the cell Plaintiff shared with a roommate, by the same Officer Jones. Plaintiff was taken to confinement and placed in a cell by herself.

184.    The following day, Plaintiff was informed by Sergeant Todd that she was being moved to a different cell, by order of the colonel.

185.    The colonel at the time was Colonel Nobles.

186.    That other cell housed inmate Tremaine Hall, and Plaintiff informed Sergeant Todd she did not feel comfortable going into that cell. She told him that she had PTSD and was in fear for her life, and also declared a psychological emergency.

187.    She spoke to a counselor and explained the issue, and said she was concerned because she had observed Hall while he was housed in P dorm, and he stated that he was not transgender, and that he had only signed up as transgender "to chase the babies".

188.    She told the counselor she was in fear for her life going into the cell with inmate Hall;

and also afraid that, due to her PTSD, she could not predict how she would act if a situation arose. She asked to be placed in an SHOS cell because there was a reasonable chance she would hurt herself or inmate Hall.

188. The counselor refused to place plaintiff on SHOS, despite the fact that she stated there was an imminent threat she might kill herself or someone else. She said, "You'll just go sit there for a few days, then get out, and what if they put you in the same cell?"

190. Plaintiff said she would rather remain on SHOS if that was the case.

191. The counselor said, "See, I'm not gonna do all that paperwork" and then told Sergeant Todd that plaintiff was cleared and could be sent back to the cell.

192. At this point plaintiff begged Sergeant Todd not to put her in the cell with Hall. Sergeant Todd said, "You're gonna go in that cell, or I'm gonna run a team and put you in that cell."

193. Plaintiff also has severe PTSD from use of force incidents described in Section 2, and was now stuck between her fear of Hall and of Sergeant Todd. She removed her handcuffs while in the holding cell, right in front of Sergeant Todd, trying to avoid being struck with them or in a use of force as it would allow the officers to open the door to the holding cell without first ordering her to submit to restraints.

194. Sergeant Todd came over and asked if the other officer had come to get the cuffs. Plaintiff just shrugged and gave a nod, and he walked away. She placed the handcuffs in her property.

195. Plaintiff was taken out of the holding cell to speak to Lieutenant Olds. He said there was no other cell plaintiff could be housed in.

196. Plaintiff said this was blatantly false, as she could be moved back to the cell she had been in, by herself, and avoid all these problems.

197. Lt. Olds said he had spoken to Mrs. Marchant and she refused to let plaintiff be moved back to the prior cell, because the wing it was on contained Close Management inmates and was therefore a security risk.

198. Plaintiff said there was a greater security risk in being put in a room with Hall, but Lt. Olds simply asked, "Are you going to the room or do we have to take you there?"

199. Considering the potential risk from Hall, versus the certain risk from staff if she refused, plaintiff went to the cell.

200. Plaintiff intended to talk to the captain on night shift, by taking the handcuffs to the shower and using them as leverage to get moved out of the cell with Hall.

201. Before that could happen, inmate Hall got high on synthetic cannabis and began to commit lewd and lascivious masturbation against plaintiff.

202. Plaintiff feared for her life and struck Hall with the handcuffs in self-defense. She

sustained serious injuries while defending herself from Hall.

203.    Plaintiff and Hall were taken out of the cell and interviewed by staff about the incident. Hall had told plaintiff to tell them "Todd had given her the handcuffs at the door to the cell, and that Todd had 'ordered a hit' on Hall; he said he would kill plaintiff if she did not tell staff that.

204.    Plaintiff told staff it was a PREA incident and she had been in fear for her life; she was asked when she got the handcuffs and said Sergeant Todd gave them to her.

205.    Plaintiff and Hall were seen by medical, and pictures were taken of their injuries.

206.    At this time, the Captain, McKinney, said to plaintiff, "You should have never been put in that cell". After this, plaintiff was placed in a cell by herself on wing J3, with the Close Management inmates.

207.    Plaintiff remained housed on wing J3, despite the alleged 'security risks', in a cell by herself.

208.    Plaintiff was interviewed the next morning by Colonel Noles, and told him everything that had occurred with the event; and, as Hall was no longer around, she volunteered the truth about how and why she had gotten the handcuffs, as well as telling Colonel Noles that Hall had told her to say what she had said about Sergeant Todd.

209.    Captain White was also present. Plaintiff told both of them in person that Hall had been 'gunning' her, slang for lewd and lascivious masturbation, and that she had been in fear for her life.

210.    Plaintiff was written 4 DRs for the incident and referred for Close Management; the DRs were for Aggravated Battery, Tampering with a Security Device, Possession of a Weapon, and Fighting. She went to DR court for the Aggravated Battery and Tampering with a Security Device and was found guilty.

211.    Only after already being found guilty of 2 DRs were the other 2 served, by Sergeant Vansuch; Plaintiff pointed out that 'Possession of a Weapon' and 'Fighting' were double jeopardy, as the DR she had already been found guilty of, 'Aggravated Battery', contained all necessary elements both fighting and possessing a weapon.

212.    Vansuch agreed that this seemed improper and did not serve or investigate the DRs.

213.    Several days later, Vansuch returned to serve and investigate the same DRs; he told plaintiff "Marchant told me to process them anyway".

214.    At the time inmate Hall was in confinement, it was for a fighting DR, which he explained to Plaintiff. The events were that he and another inmate, 'Money' got in a fight in the day room of J4 dormitory.

215.    In this fight, 'Money' broke a broom and stabbed inmate Hall with it, causing more severe injuries than those resultant from plaintiff. This occurred on camera.

216.    Breaking a broom constituted Destruction of State Property.

217.    The broken broomstick constitutes Possession of a Weapon.

218.  Stabbing inmate Hall with the broken broomstick constitutes Aggravated Battery.

219.  Inmate 'Money' was not written any DR other than fighting, nor were they served a referral for Close Management. By the description of events, inmate 'Money' was clearly the aggressor in the incident and should have been held to the same degree of punishment, or greater, than plaintiff was, for literally only days before committing aggravated battery on the exact same inmate plaintiff was accused of committing aggravated battery against.

220.  Several days later, plaintiff explained all these events to Dr. Lloyd. He stated that no PREA investigation had been begun; he submitted the notice of it.

221.  Captain White, the exact same person plaintiff had told about the PREA incident, came to take plaintiff's statement, despite the fact that all earlier statements contained the PREA allegation.

222.  Captain White returned at a later date, and asked plaintiff for another statement, stating that some previous statements had been lost.

223.  At ICT, for the Close Management referral, plaintiff noted that the referral states she admitted to all of the DRs and to hitting Hall; but, it does not state that she was in fear for her life; and falsely portrays her as the aggressor when that's not the case.

224.  At ICT, Merchant made a note of plaintiff's PREA allegations, and appeared to be unaware of them.

225.  Lieutenant Olds investigated the PREA and failure to protect grievance plaintiff wrote, despite being a party to it; predictably he found no issue with plaintiff being placed in the cell with Hall.

226.  Plaintiff appealed this and was denied. She appealed it to the Secretary's Office and was denied.

227.  Plaintiff was placed on Close Management 1, which is extended solitary confinement, due to this incident, and appealed the decision to the Secretary's Office, describing all the issues with the accusation, and the grossly unequal treatment compared to inmate 'Money'. She never received a receipt for, or response to, that grievance and believes it was intentionally destroyed.

228.  Plaintiff believes that, given the totality of the incident, it was not only negligent but actively malicious actions on the part of Colonel Noles and Merchant that put her into danger; then gave her the harshest possible penalty for defending herself from the situation they put her in.

229.  Plaintiff personally overheard Merchant make disparaging comments about transgender female inmates; stating 'they will never be real women' and 'there are no females housed at this institution', and 'you're still a man and can be housed with men'. Merchant did not make these comments about plaintiff specifically – if she had, plaintiff would have reported her for sexual harassment.

230.  After being placed on CM i, plaintiff was transferred to Florida State Prison.

231.  While at Florida State Prison, housed in E Dormitory cell 1301, plaintiff was scheduled for

a medical call-out, in mid-September, about her hormone medications.

232.    Officer Tanner asked plaintiff if she wanted to go to her call-out, and she said yes.

233.    Tanner returned several hours later, with a nurse whose name plaintiff was told is Jarrod, and asked, " Do you want to sign your refusal?"

234.    Plaintiff stated she had not refused, and that she needed to go to her call-out. She declared a medical emergency. Tanner and Jarrod ignored her and walked away.

235.    Plaintiff declared a medical emergency to the dorm lieutenant, and he called medical; he returned and told her the call-out had been rescheduled and she agreed to wait until it came up again.

236.    In October, the callout was scheduled again. Despite that he had never been assigned to the dorm she was housed in at the time, B dorm, Officer Tanner again showed up with nurse Jarrod. They never even asked if plaintiff wanted to go to her call-out, just asked, " Do you want to sign your refusal?"

237.    Plaintiff spoke to the director of nursing about this problem, as nurses were asking her why she refused her call-out, and warning her it could put her health, and medication at risk.

238.    In November, Officer Tanner and Nurse Jarrod again appeared, and again asked, " Do you want to sign your refusal?"; no one ever asked her if she wanted to attend the call-out at all, or informed her it was on that day.

239.    Shortly after that, one of plaintiff's prescribed medications, Medroxy progesterone, was discontinued with no warning given and no explanation.

240.    Plaintiff is currently grieving both the issue of Tanner and Jarrod 's denial of her health care and falsification of documents, and the discontinuation of medically necessary medication.

241.    Plaintiff asserts that, if all the harm she has suffered due to continued placement in unsafe conditions, and denial of health care, and continual abuse from inmates and staff, does not constitute a pattern of abuse, no such thing exists.

242.    Given the amount of incidents and grievances about the harm plaintiff has suffered, it is not reasonable to suggest that any state officials responsible for placing plaintiff in a male institution, denying her grievance about placement in a female institution, denying her grievances about prosthetic management, and denying her grievance about the necessity of Sexual Reassignment Surgery, are unaware of the harm their denials directly exposes her to.


2.   Malicious Abuse by Staff


243.    Except for certain minor incidents when plaintiff first entered FDOC custody, and was

not classified as transgender, plaintiff was at all times between July 2014 and July 2017 subjected to what is colloquially referred to as ' split searches'.

244. This meant that, when being strip searched, plaintiff's upper body was searched by a female officer, and lower body by a male officer.

245. Policy has always been for plaintiff to be pat-searched by female officers only. She has been issued specially-made ' passes' to carry to inform staff of it this many times.

246. The rationale for this is that, because plaintiff has breasts, it is a PREA violation for male staff to touch or view her breasts, the same as it is for them to do so to any inmate assigned as female.

247. 'Voyeurism' is a form of sexual abuse defined by federal and state PREA standards.

248. In around January 2018, members of the FDOC's ' legal department' changed this policy and began to insist that plaintiff had to be strip searched by male officers only and is required to show them her breasts.

249. Plaintiff is aware of no reason for this change to a more restrictive and invasive policy.

250. Plaintiff has not been able to speak to this ' legal department', nor has she been able to obtain names of any persons responsible for this decision.

251. Plaintiff first became aware of this in January 2018, at Zephyrhills CI, when she was called from her work assignment to go to an outside medical doctor. She was entirely surprised when the major, with no explanation, told her they would not let her go to her call-out unless she stripped for male officers, showing them her breasts.

252. Plaintiff refused, and called PREA on the major, He wrote her a DR and she was taken to confinement and placed in a shower, used like a holding cell.

253. When ordered to strip and show her breasts to male officers, plaintiff refused and was pepper sprayed. Though she was in the shower, staff turned off the water to forbid her to clean off the pepper spray until she showed them her breasts.

254. Thinking this an isolated incident of abuse, for which she would be fully vindicated by the video evidence, plaintiff complied; she was allowed to shower, then placed in a cell.

255. Plaintiff grieved this as a PREA incident, and was denied. The warden, Tamara Poynter, spoke to her personally and informed her that the ' legal team' had changed the policy.

256. This specific policy is not written anywhere in the Florida Administrative Code that plaintiff is aware of ; but, neither was the ' split search' policy.

257. Warden Poynter stated that the ' legal team' had told her this was based on a change in case law, and that she and her staff were' just following orders'.

258. Plaintiff is unaware of any such case law on the subject, and has been able to find no

record whatsoever of any that came out in the State of Florida, the 11th Circuit, or from the Supreme Court in the period of 2017-2018.

259. Plaintiff's appeal about this incident was denied. She wrote many other grievances about this, and spoke to an inspector general, but nothing ever came of it.

260. Plaintiff informed psychological staff that she was suicidal in early 2018, following this incident, and was sent to an SHOS cell; in doing so, staff at Zephyrhills CI again insisted that she had to be strip searched by male officers, and show them her breasts.

261. Plaintiff refused, and force was used again, this time to cut off her clothes while she was held down by male officers.

262. Some of the officers later spoke to her about the incident and described that it made them uncomfortable, but they were afraid of losing their jobs if they spoke out or disagreed. Plaintiff believes one was named Mitchell.

263. Plaintiff spoke to the Colonel of the institution, Howard E. Tucker III, about these issues. Colonel Tucker stated to her that he was 'just following orders', but also said that he remembered plaintiff from De Soto CI in 2014, when he was, plaintiff believes, a major there.

264. Colonel Tucker stated that he recalled that strip searches of plaintiff were done in the 'split search' method, when he was at De Soto CI, and also stated that they had been done that way for transgender inmates for several years before that.

265. Plaintiff recalls that she was subjected to one other such use of force at Zephyrhills CI, while housed in the mental health dorm there.

266. When plaintiff was transferred to Walton CI, Colonel Tucker came to her cell and asked if it would be okay if he conducted the strip search required to transfer her personally, and assured her he did not mean for it to be disrespectful.

267. Plaintiff complied, and was transferred to Walton CI. Upon arriving at Walton CI, she was informed by the warden or assistant warden there that the 'legal team' had specifically called ahead and instructed them not to do 'split searches' but to have only male officers strip search her.

268. Staff at Walton CI assured her they did not mean for it to be abusive or disrespectful, and offered to record the officers performing the search in order to at least ensure that nothing else untoward occurred. Plaintiff complied.

269. This transfer had given plaintiff some hope that the 'new policy' would not be known or in force at her new institution, but the fact that the 'legal team' seemed to be specifically targeting her with this policy and had called in advance to ensure it was enforced made her feel degraded and hopeless. This was the factor that caused the incident in confinement to make her

attempt suicide.

270. Plaintiff was not Strip Searched going to the hospital. She was, upon returning to Walton CI, when placed in an SHOS cell, but the officer did not order her to take off her bra, and let her cover up with the SHOS - issued shawl before handing it over.

271. Plaintiff was transferred to Santa Rosa CI Annex to the CSU dorm there; prior to leaving Walton She was Strip searched, but the officer let her cover her breasts when taking off the shawl, then put her bra on first.

272. Plaintiff does not recall being Strip Searched when she arrived at Santa Rosa CI Annex; though She was required to give over all clothes because she was on SHOS, the officer gave her the shawl first and she was able to put it on.

273. While at Santa Rosa CI Annex, plaintiff was informed that, because she was being housed in a dorm for CM inmates, she had to be Strip searched every time she came out of the cell. This included to talk to mental health staff about the trauma of being Strip searched by male officers that had driven her to attempt suicide in the first place.

274. Plaintiff refused to come out of the cell for any reason, and declared a hunger strike. She told mental health, when they came to the cell, why she refused to come out - because being subjected to abuse in order to access mental health care is self-defeating.

275. She also had the warden come and speak to her personally, and plead for her to come out and speak to the MDST (Multi-Disciplinary Services Team) so she could get off of SHOS. She spent about 14 days on SHOS and did not eat for over ten.

276. The warden was willing to speak with her about the policy change, although he said he was 'just following orders'. He stated that the 'legal Team' had called in advance and informed him of the new policy.

277. He also stated to plaintiff that the 'legal Team' had told him the reason for the change was a ruling in Plaintiff's case. Plaintiff said that didn't make sense because her lawsuit against the FDOC (Keohane v. Jones 4:16-cv-00511-MW-CAS) had nothing to do with that subject.

278. Plaintiff had a legal call with her attorney in that case, Daniel Tilley, and was told she had to be strip searched by male officers in order to attend her attorney visit. She attempted to cover her breasts with an arm but the officer told her to move her arm or else she would not be coming out.

279. Plaintiff also came out for MDST, hoping to get away from Santa Rosa as quickly as possible; and the same officer did the search, requiring her to show him her breasts.

280. Plaintiff was taken off of SHOS, and then sent to the TCU, also at Santa

Rosa CI Annex, which was also for CM inmates. This is also unusual because while many prisons have both a CSU and TCU an inmate is not supposed to be transferred from one to the other, by plaintiff's understanding of policy.

281. Plaintiff had specifically requested not to be sent to TCU because she was concerned about further strip searches causing her mental health to degrade, thus creating a vicious cycle that would lead to another suicide attempt, and asked to be sent to General Population instead, which would be safer. The MDST agreed with this assessment.

282. Their decision was overridden by someone named "Dr. Austerheimer", or something which sounds similar to that. Plaintiff overheard mental health staff say the name, or heard them say it once, but all refused to repeat or spell the name for her.

283. "Dr. A" ordered plaintiff to the Santa Rosa CI Annex because he required more evidence of plaintiff's ability to "socially adjust", according to plaintiff's counselor.

284. This amounted to attending the counseling sessions and mental health groups which plaintiff had refused to go to because she had to be strip searched by, and show her breasts to, male officers to attend them.

285. Plaintiff is highly traumatized every time she is forced to show her breasts to male officers. More than any other traumatic event, plaintiff has constant anxiety about this trauma, extreme anxiety and depression when it occurs, and has had recurring nightmares about being forced to show her breasts to male officers.

286. Plaintiff attended approximately three out of cell activities in the TCU, and one legal call, and then was transferred back to Walton CI.

287. Plaintiff was not strip searched again at Walton CI, until the day she was transferred to Wakulla CI annex, to the DTU down there; and then, the officers did not require her to specifically show them her breasts.

288. Plaintiff was at Wakulla CI Annex for approximately 21 months, from August 2018 to April 2020. At no time at Wakulla CI Annex was she required to show her breasts to any male staff.

289. Plaintiff was strip searched leaving a work assignment one time, but the officer conducting the search was a feminine gay male who did not require her to take off her bra or panties.

290. Plaintiff was strip searched leaving a visitation with her parents (but not eating); the duty warden authorized a female officer to do the strip search, and plaintiff complied. Neither she nor the officer had any objection or disrobed resulting from the search.

291. Plaintiff and her roommate, inmate Pittman, were both strip searched as a part of a mass search in their dormitory; the overseeing officer authorized female officers to strip search

them, and neither had any issue or discomfort with doing so.

292.    Plaintiff was placed in confinement twice, while at Wakulla CI Annex. Both times the male down officers did not strip search her at all.

293.    Plaintiff was strip searched upon being transferred to Florida State Prison, but the officer did not require her to take off her bra or panties.

294.    Florida State Prison is a CM institution, and all inmates are required to be strip searched when they leave their cells.

295.    The official memo plaintiff has states that " If housed in a male institution, these searches will be conducted ~~this~~ by male staff ".

296.    This quotation is nearly identical to the grievance denials plaintiff received about this issue.

297.    Plaintiff has grieved this as a violation of her federal right to be protected from all forms of sexual abuse from inmates and staff alike. The FDOC admits that it is sexual abuse for a male officer to touch her breasts, even in clothed pat searches.

298.    In consistently, the FDOC maintains that it is not sexual abuse for that same male officer to instead order her to show him her breasts; and it authorizes him to use force against her with no meaningful consequence if she refuses to do so.

299.    Plaintiff has referred to this as the ' strip club policy ', as it enforces a dual standard where male officers can ' look but don't touch '.

300.    In plaintiff's experience, the overwhelming majority of male officers are uncomfortable with enforcing this policy. The majority of them allow her to keep her bra on and ' shake it out ', or keep it on and then be searched by a metal detector after being taken out of the cell.

301.    This means that those who choose to enforce it strictly are making a personal choice to do so, and not ' just following orders '.

302.    One such example is from a dispute with officer Brian Starling, at Florida State Prison; at about 10:45 on September 19, 2020, officer Starling fabricated an incident in order to strip search plaintiff.

303.    Starling stated, " I don't care what he identifies as, I'll strip him like a man if I want to ". He requested to the lieutenant that the lieutenant specifically allow him to do the strip search.

304.    During the strip search, Starling specifically ordered plaintiff to take off her bra and show him her breasts, which he looked directly at for an unnecessary amount of time.

305.    Given the official memo does not specifically name an inmate's breasts as an

area to be searched. It states 'The entire body will be checked including armpits, hands, pubic region, between the toes, soles of the feet, external anal area, and inner portions of the legs.'

306.  With officers that require plaintiff to take off her bra, there is even a distinction, as many of these permit her to show all the above-mentioned areas without specifically showing them her breasts.

307.  There is absolutely no legal justification for this 'strip club' policy that plaintiff is aware of, nor for the change of a newrowly-tailored policy that provides for the rights of persons who have both male and female anatomy, regardless of housing, to blanket policy based solely upon where an inmate is housed.

308.  Some staff have supposed it is a security issue, but as the method of the 'split search' ensures total visual coverage of the inmate (and strip searches are frequently conducted in a loose or rushed manner) this is unreasonable.

309.  Another possible excuse is that it is difficult to find female officers to do it; but as all strip searches require two officers to be present, and there is always advance notice of when one will need to be performed, this too is unreasonable.

310.  With no other explanation known to plaintiff, she believes this 'strip club' policy was created to intentionally harass and abuse transgender inmates.

311.  Chiefly, given that it occurred shortly after plaintiff went to trial in the case Keohane v. Jones, and was specifically enforced by the 'Legal Team' against her across several institutions, she believes it was made policy to maliciously retaliate against her for the lawsuit Keohane v. Jones.

312.  Further, Plaintiff believes her placement at Santa Rosa Correctional Institute Annex was also done maliciously by staff at Central Office in order to expose her to this 'strip club' policy and 'socially abuse' her; i.e. to traumatize her and stop her from speaking out about the abuses suffered by transgender females in the Florida Department of Corrections.

313.  Note, in contrast with the 'Hall Incident', that when it suited the purpose of harming plaintiff, she was housed around CM inmates for no apparent reason; but when the shoe was on the other foot being housed around CM inmates was a 'security issue' that was used as justification to place her in danger.

314.  Further, plaintiff has repeatedly informed mental health staff that placement on JMOS is very harmful to her, as it greatly exacerbates her dysphoria, because she is not allowed to have underwear that is necessary to ignore the reminder caused by her body's current state, or to sufficiently shave her face.

315.    According to FDOC policy, inmates housed in male institutions on Disciplinary Confinement, Administrative Confinement, SHOS, and certain other restrictive status, are not permitted to use or possess their personal electric razors.

316.    Inmates in male institutions are not permitted to use shaving razors at all.

317.    After succeeding in Keohane v. Jones, plaintiff was given access to razors, as female inmates are allowed to use razors to shave even in confinement settings.

318.    The 'Legal Team' called the institution, Wakulla CI Annex, and instructed them to take back all of the shaving razors issued to plaintiff, for no given reason.

319.    Plaintiff also purchased a pair of earrings, approved for female inmates, through the female quarterly canteen order form. The 'Legal Team' specifically called and forbade the institution to allow her to have them, despite them clearly being a 'female canteen item'; the earrings were rejected and plaintiff was refunded their cost.

320.    Transgender inmates have since been given altered 'alternate order forms' that do not include earrings at all, for no given reason.

321.    The entire concept of the Gender Dysphoria Review Team is legally suspect, as it consists of nonmedical staff as well as medical staff; who are authorized to make medical decisions about the care gender dysphoric inmates receive.

322.    There is also no listing of the GDRT's members, or method to contact them, that plaintiff is aware of.

323.    Further, these members of the GDRT have never once met with or spoken to plaintiff about any aspect of her medical care, but the decisions by all plaintiff's primary care providers have to be screened and approved by the GDRT.

324.    No other medical or psychological condition has a 'review team' which must review, then accept or deny treatment presented by primary care provider.

325.    Plaintiff has never had any communications at all with any member of the GDRT about her placement, and is aware of no actual decisions ever made about it.

326.    Plaintiff also has never been actually denied for Sexual Reassignment Surgery by the GDRT; she has never had any communication with them about it at all.

327.    Despite repeatedly asking primary care providers for Sexual Reassignment Surgery, plaintiff has never been evaluated for it, nor has any attempt to evaluate her for it ever been made. It is as if her requests simply vanish into the ether.

328.    As there is no apparent benefit to any person based upon its existence, or even a clear reason for its existence, plaintiff believes the Gender Dysphoria Review Team to be a hurdle maliciously imposed by the 'Legal Team' to deny and obfuscate the treatment of

341.   Granting Plaintiff Reign J. Kechane compensatory damages for the years of physical harm, sexual abuse, emotional suffering, and trauma she has and continues to suffer, in an amount deemed appropriate to each individual injury, and

342.   Granting Plaintiff Reign J. Kechane punitive damages against all parties found to have acted negligently, unlawfully, maliciously, or in order to retaliate against plaintiff, for an amount against each individual in accordance with the severity of their actions, and

343.   A jury trial on all issues triable by jury,

344.   Recovery of any costs in this suit, and,

345.   Any additional relief the court deems just, proper, and equitable.

Dated: <u>November 27ᵗʰ, 2020</u>

## Verification

I have read the foregoing complaint and hereby verify all the matters alleged therein are true; except as to matters alleged upon information and belief, and, as to these, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Raiford, Florida on November 27ᵗʰ, 2020.

Respectfully Submitted,

Reign J. Kechane
DC# Y55036
Florida State Prison
P.O. Box 800
Raiford, FL 32083

protection under the law, guaranteed by the United States Constitution, resulting in pain, suffering, physical injury, and emotional distress.

336.      Defendants Inch, Members of FDOC Legal Department, Members of FDOC Gender Dysphoria Review Team, J. Coker, McLellan, Tanner, and Tammara Poynter, have maliciously interfered with the treatment of plaintiff's medical needs, as non-medical personnel, violating plaintiff's right to be free of Cruel and Unusual Punishment, guaranteed by the Eighth Amendment to the United States Constitution, and of equal protection under the law, guaranteed by the Fourteenth Amendment to the United States Constitution.

337.      Defendants Inch, Members of FDOC Legal Department, Members of FDOC Gender Dysphoria Review Team, J. Coker, Todd, Marchant, Olds, Dixon, Gould, Howard E. Tucker III, and Tammara Poynter, have also engaged in malicious abuse of plaintiff, by knowingly and intentionally placing her in danger, and in situations where the risk of sexual abuse was known to them or the sexual abuse was directly ordered by them and carried out by officers following their orders, in order to retaliate against plaintiff because plaintiff has challenged their unlawful, malicious, and prejudicial actions, violating her Eighth Amendment right to be free of Cruel and Unusual Punishment, and her Fourteenth amendment right to Equal Protection under the law, guaranteed by the United States Constitution, causing plaintiff pain, suffering, physical injury, and emotional distress.

338.      Plaintiff Reiyn J. Keohane has no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless the Court grants the declaratory and injunctive relief plaintiff seeks.

## VII. Prayer for Relief

Wherefore, the plaintiff respectfully prays the court enter judgement:

339.  Granting plaintiff Reiyn J. Keohane a declaration that the acts and omissions described herein violated her rights under the Constitution and laws of the United States, and

340.  A preliminary and permanent injunction ordering that (1) plaintiff be granted Sexual Reassignment Surgery (2) and access to facial hair removal care; (3) and be placed in a secure cell seperate from other inmates, in a female institution while awaiting this treatment, (4) then reclassified and permanently assigned to female institutions only; (5) and that the malicious 'strip club' policy immediately cease and return to the 'split search' policy; (6) and all actions performed by non-medical staff to interfere with plaintiff's medical care cease immediately. And,

Gender Dysphoria, in exactly the manner it has regarding her repeated requests and grievances for Sexual Reassignment Surgery.

329.    Plaintiff notes that 'I was just following orders' is the same excuse used by accused Nazi SS members who had operated concentration camps, at the Nuremberg trials. It was found to be insufficient in all cases.

## V. Exhaustion of Legal Remedies

330.    Plaintiff Reiyn J. Keohane has used the prisoner grievance system and exhausted as many of the above-mentioned claims as she possibly could. Due to the loss of several items of paperwork plaintiff does not know the exact dates of all the grievances she has filed; or the exact names of all persons involved, but the FDOC is required to keep records of all of these and they can easily be recovered during the discovery process.

331.    Plaintiff attaches Exhibit A, the exhausted grievance and appeal of the 'Dr. Zayas Referral'; the grievance was filed on 3-1-2020. On 3-20-2020 it was sent a response stating that it was denied. On 3-24-2020 she appealed this decision.

## VI. Legal Claims

332.    Plaintiff realleges and incorporates by reference paragraphs 1-331.

333.    Defendants Inch, Members of FDOC Legal Department, Members of FDOC Gender Dysphoria Review Team, Michelle Schovest, T. Bowden, E. Hand, G. Espino, McLellan, and Tamara Poynter, in their deliberate indifference to plaintiff's serious medical need, of which they had personal knowledge of the harms caused by denial, violated plaintiff's right to be free of Cruel and Unusual Punishment, guaranteed by the Eighth Amendment of the United States Constitution.

334.    Defendants Members of FDOC Legal Department, Members of FDOC Gender Dysphoria Review Team, Tanner, and Jarrod, have also actively taken measures to deny plaintiff access to medical care by even being able to speak to her doctors and the people responsible for her care, creating a malicious non-medical obstacle to recieving care, violating plaintiff's right to be free of Cruel and Unusual Punishment, guaranteed by the Eighth Amendment of the United States Constitution.

335.    Defendants Inch, Members of FDOC Legal Department, Members of FDOC Gender Dysphoria Review Team, J. Coker, Todd, Marchant, Olds, Dix, Niles, Sherwood E. Tucker III, and Tamara Poynter have, with personal knowledge of the risk of serious harm, negligently placed plaintiff into danger from which she has suffered Cruel and Unusual Punishment, violating plaintiff's Eighth Amendment right, guaranteed by the United States Constitution, and her Fourteenth Amendment right to equal

## VI. Legal Claims

13.   Plaintiff realleges and incorporates by reference paragraphs 1-12.

14.   The deliberate indifference to the plaintiff's serious medical needs, the harm caused by denial of those serious medical needs, and the wanton negligence by which plaintiff has suffered a pattern of abuse pursuant to the refusal to provide adequate care and placement, which has seen plaintiff's concerns for her own safety and security ignored and resulted in her placement in unsafe conditions that have repeatedly led to assault, battery, and sexual abuse, violates plaintiff Reign J. Keinonis's rights and constitutes Cruel and Unusual Punishment under the Eighth Amendment to the United States Constitution and denial of equal protection of law under the Fourteenth Amendment to the United States Constitution.

15.   The plaintiff had no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendant unless this court grants the declaratory and injunctive relief plaintiff seeks.

## VII. Prayer for Relief

Wherefore, plaintiff respectfully prays that this court enters judgement granting plaintiff:

16.   A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the United States.

17.   A preliminary and permanent injunction ordering Mark S. Inch to provide that plaintiff provisionally be housed in a secure environment seperate from all other inmate, at a female institution, while awaiting Sexual Reassignment Surgery, that plaintiff be granted Sexual Assignment Surgery and that this care be provided in accordance with all applicable state and federal laws, and that once Sexual Reassignment Surgery is complete plaintiff be reclassified and permanently assigned to a female institution, and that plaintiff be granted accepted means to provide for hair removal treatment.

18.   Compensatory damages in the amount of $120,000 against the defendant for harm suffered by the pattern of abuse that has caused her physical injury, and extreme emotional and psychological harm.

19.   A jury trial on all triable issues.

20.   Plaintiff's costs in this suit.

21.   Any additional relief this court deems just, equitable, and proper.

Dated :   24 November 2020
             Respectfully   Submitted ;


Reign J. Keohane
P.O. Box 800
Raiford , FL 32083


## Verification


I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief; and, as to these, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at   Raiford , Florida  on  24 November 2020.


Reign  J.  Keohane
DC # Y55036 , Florida State Prison
P.O. Box 800
Raiford , FL  32083

development, and is intersex, which has not been determined or diagnosed as yet by the FDOC despite her consistent requests for assessment; this would further support her placement in a female facility; or any kind of dedicated medical or protective unit; which has not been done, or, to her knowledge, ever assessed beyond a superficial level.

9.    4. Sexual Reassignment Surgery would alleviate the plaintiff's dysphoria; which has led her to multiple suicide attempts, including an overdose on over 30,000 mg of Tylenol in May 2018 for which she was hospitalized, and multiple attempts to hang herself. Further, it would require her to be housed in a female facility; which would eliminate the harassment and violence from male inmates, the risk of further sexual assault, the risk of further uses of force by male staff, and all other problems that arise from her being housed in a male facility; It would eliminate the need for any special housing, access to separate showers or protective management, and is the only cause of action that satisfies the potential dilemma of where to house her, as posed between the actual and persistent risk to her life resultant from being housed in a male facility, and the theoretical risks stated by some FDOC officials if she were to be housed in a female facility. Plaintiff's life is at risk from the continued denial of this treatment.

10.   5. In November 2019, Plaintiff had an appointment with Dr. Zayas, the FDOC's contracted endocrinologist, and a Medical Doctor, who provided for plaintiff's Hormone Replacement Therapy and related aspects of her Gender Dysphoria care. After explaining all the above mentioned harm and suffering to Dr. Zayas, Dr. Zayas stated that she would write a referral for Sexual Reassignment Surgery, and e-mailed it to the FDOC.

11.   6. Plaintiff spoke to Dr. Shawn Lloyd, Director of Mental Health for Wakulla Correctional Institute Annex and Overseer of the Gender Dysphoria evaluation team at the institution about this referral. Dr. Lloyd had been plaintiff's mental health provider from August 2018 to April 2020, and she spoke to him about the referral in December 2019 and on following visits until she was transferred from that institution. Dr. Lloyd said that he supported the referral, but that, reviewing plaintiff's medical file, could find no record of it in the FDOC's possession. After discovering that the FDOC did not have a record of the referral, plaintiff suspected foul play, as all other aspects of the e-mail that Dr. Zayas had related to her personally (alterations to medication; a new prescription) were in record but the referral was not. At this time plaintiff filed a grievance to address the issue.

## Ⅴ. Exhaustion of Legal Remedies

12.    Plaintiff Reign J. Kechane used the prisoner grievance system at Wakulla Correctional Institute Annex to try to solve the problem. On 3-1-2020 plaintiff presented the facts relating to this complaint. On 3-20-2020 plaintiff Reign J. Kechane was sent a response stating that the grievance had been denied. On 3-24-2020 she appealed the denial of the grievance.

MAILED/FILED
WITH AGENCY CLERK

JUN 05 2020

Department of Corrections
Bureau of Inmate Grievance Appeals

**PART B - RESPONSE**

E130I

| KEOHANE, REIYN | Y55036 | 20-6-11377 | FLORIDA STATE PRISON | D1107S |
|---|---|---|---|---|
| NAME | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Appeal Denied:

Your request for administrative remedy was received at this office and it was carefully evaluated. Records available to this office were also reviewed.

In addition, the institution was contacted and they provided this office with information regarding the issue you presented.

Please be advised that an inmate has the responsibility to write the grievances legibly and if not then it can be returned to the inmate without processing.

It is the responsibility of your health care staff (medical and mental health) to determine the appropriate treatment regimen for the condition you are experiencing.

In the future, please be advise that the grievance process should not be used to request medical or mental health treatment.

You may address medical issues at your chronic illness clinic visits and you may address mental health issues by submitting an Inmate Request form (DC6-236) to the mental health staff or discuss your concerns with the mental health counselor during your follow-up visits.

CONFIDENTIAL HEALTH RECORD/CARE INFORMATION INTENDED FOR ADDRESSEE(S) ONLY. UNAUTHORIZED RELEASE OR DISCLOSURE MAY VIOLATE STATE AND FEDERAL LAW.

Michelle Schouest, IISC

| _Michelle Schouest_ | _T. Bowden_ | 6/4/20 |
|---|---|---|
| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | DATE |

Med  RECEIVED BY

**FLORIDA DEPARTMENT OF CORRECTIONS**

APR 0 1 2020

**REQUEST FOR ADMINISTRATIVE REMEDY OR APPEAL**

WAKULLA C.I. WAREHOUSE

RECEIVED
APR 0 3 2020
Inmate Grievance Appeals

☐ Third Party Grievance Alleging Sexual Abuse

TO: ☐ Warden   ☐ Assistant Warden   ☒ Secretary, Florida Department of Corrections
From or IF Alleging Sexual Abuse, on the behalf of:

| Keohane          Reiyn      J | Y55036 | Wakulla CF Annex |
|---|---|---|
| Last       First     Middle Initial | DC Number | Institution |

**Part A – Inmate Grievance**

20-6-11377

The response to Formal Grievance Log # 2003-118-007, attached, is wholly insufficient to address the complaint for the following reasons, and represents a willful obstruction of the provision of medically necessary care:

1. Chronic care issues do not need to be addressed through the sick call system. I have a standing diagnosis of Gender Dysphoria for which I receive Hormone Replacement Therapy. I spoke to the treating physician at a regularly-scheduled chronic care meeting, the same conference with Dr. Zayas that I described in the attached grievance. I am not required to submit a sick call to further address the same complaint that I have already spoken to a physician about - one I have in fact aired with all members of the Gender Dysphoria treatment team at every possibility for the past several months. All staff are well aware of the complaint and as it is treatment for an existing, diagnosed, chronic care condition, already addressed at the chronic care clinics I receive regularly for this specific diagnosed condition, a sick call is not necessary - it would, in fact, be superfluous and wasteful to start the sick-call process anew to address an issue I am already receiving treatment and chronic care clinics for. As I am not required to submit a new sick call each time I see Dr. Zayas, or each time I have my hormone medication adjusted, or have a new medication prescribed for the further treatment of Gender Dysphoria, such as when she prescribed me finasteride, neither am I required to submit a sick call for other possible treatments of Gender Dysphoria. As stated in the attached, I addressed the complaint to Dr. Zayas directly, and her response was that she would make a recommendation for surgery. The issue I am grieving is that that request, and her prescription of a facial hair suppressant product, have been repeatedly ignored and refused. This is far from a new process - I am grieving the existing answers I have already received from the involved health-care officials, and have every right to do so.

2. Further, no part of the Gender Dysphoria evaluation system is addressed through the sick call system, and nowhere in the Chapter 33 policy, Classification and Treatment of Gender Dysphoria and Intersex inmates, is there any statement that any part of Gender Dysphoria treatment is addressed through the sick call system. It is, by policy, addressed through Mental Health and chronic care clinics after mental health, & Gender Dysphoria Review Team recommendations. I have repeatedly raised the complaint through these channels, as proper; again, my complaint is that this has been consistently refused and ignored through the correct, existing channels.

| 3-24-20 | |
|---|---|
| DATE | Y55036 |
| | SIGNATURE OF GRIEVANT AND D.C. # |

**\*BY SIGNATURE, INMATE AGREES TO THE FOLLOWING # OF 30-DAY EXTENSIONS:**

Ø  /
\#     Signature

**INSTRUCTIONS**

This form is used for filing a formal grievance at the institution or facility level as well as for filing appeals to the Office of the Secretary in accordance with Rule 33-103.006, Florida Administrative Code. When an appeal is made to the Secretary, a copy of the initial response to the grievance must be attached (except as stated below).

When the inmate feels that he may be adversely affected by the submission of a grievance at the institutional level because of the nature of the grievance, or is entitled by Chapter 33-103 to file a direct grievance he may address his grievance directly to the Secretary's Office. The grievance may be sealed in the envelope by the inmate and processed postage free through routine institutional channels. The inmate must indicate a valid reason for not initially bringing his grievance to the attention of the institution. If the inmate does not provide a valid reason or if the Secretary or his designated representative determines that the reason supplied is not adequate, the grievance will be returned to the inmate for processing at the institutional level pursuant to F.A.C. 33-103.007 (6)(d).

RECEIVED

4/1/20

MAR 30 2020

Submitted by the inmate on: _____
(Date)
Wakulla Assistant Warden
Program/Grievance

**Receipt for Appeals Being Forwarded to Central Office**

Institutional Mailing Log #: MR20040108

(Received By)

2003-118-007

DISTRIBUTION:   INSTITUTION/FACILITY        CENTRAL OFFICE
                INMATE (2 Copies)           INMATE
                INMATE'S FILE               INMATE'S FILE - INSTITUTION/FACILITY
                INSTITUTIONAL GRIEVANCE FILE  CENTRAL OFFICE INMATE FILE
                                            CENTRAL OFFICE GRIEVANCE FILE

DC1-303 (Effective 11/13)    Incorporated by Reference in Rule 33-103.006, F.A.C.

## PART B - RESPONSE

| KEOHANE, REIYN | Y55036 | 2003-118-007 | WAKULLA ANNEX | J3110L |
|---|---|---|---|---|
| NAME | NUMBER | FORMAL GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

CONFIDENTIAL HEALTH RECORD/CARE INFORMATION INTENDED FOR ADDRESSEE(S) ONLY.
UNAUTHORIZED RELEASE OR DISCLOSURE MAY VIOLATE STATE AND FEDERAL LAW.

Your request for Administrative Remedy or Appeal has been received, reviewed and evaluated. An investigation reveals the following:

This needs to be addressed through the sick call system.

Based on the foregoing, your Request for Administrative Remedy is D E N I E D.  You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form, providing attachment(s) as required by Chapter 33-103, and forwarding to the Bureau of Inmate Grievance Appeals, 501 South Calhoun Street, Tallahassee, Florida 32399-2500.

Responding Employee: E. Hand, Health Administrator

Signature of Representative: J. Coker, Warden

| | |
|---|---|
| SIGNATURE AND TYPED OR PRINTED NAME EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE |
| | DATE |

MAILED

MAR 2 0 2020

ASSISTANT WARDEN

**FLORIDA DEPARTMENT OF CORRECTIONS**

**REQUEST FOR ADMINISTRATIVE REMEDY OR APPEAL**

☐ **Third Party Grievance Alleging Sexual Abuse**

TO: ☐ Warden      ☐ Assistant Warden      ☐ Secretary, Florida Department of Corrections

From or **IF Alleging Sexual Abuse**, on the behalf of:

| Keohane | Reiyn | J | V55036 | Wakulla CI Annex |
|---|---|---|---|---|
| Last | First | Middle Initial | DC Number | Institution |

2003-118-007

Chief Medical Officer                 Part A – Inmate Grievance

I am a transgender woman, and require treatment for permanent facial hair removal, and for sexual reassignment surgery, to alleviate the severe depression, dysphoria, and intense suffering I experience on a day to day basis. I was written a prescription for hair-suppressant cream, and a recommendation for SRS by Dr. Zayas, the D.O.C.'s consulting endocrinologist, the last time I saw her, but since then have been told that the hair suppressant was "disapproved", and told absolutely nothing about SRS whatsoever. Not a day goes by that I do not experience extreme depression and anxiety about these issues: in regards to hair, I am usually able to use a personal electric razor, but as I am currently prohibited from accessing this personal property while in confinement, I am only able to receive a "clipper shave" once a week, which does not even result in a clean shave after its immediate occurrence. This impossibility of removing facial hair forces me to drastic measures, such as plucking hairs by hand until my fingers become blistered and bleed, or using a small fire to burn it from my face. I will use any means necessary to remove as much of this hair as possible, as the alternative is intense feelings of disgust and self-loathing that severely exacerbate the dysphoria and thoughts of self-harm, having others who are preventing me from treatment exacerbating the problem, and suicide. Further, the lack of surgery is a constant struggle, which results in a host of serious issues; these can be considered in two categories, of internal and external anguish. The internal anguish is, again, severe dysphoria leading to thoughts of harm and suicide; the external is the constant daily risk of sexual harassment and assault I face by being forced, based only on the lack of surgery, to be housed with male inmates, and the actual physical harm and ensuing trauma I have been subjected to because of it. This present danger is the result of both the predation of male inmates, and of the utter lack of concern for my safety in accordance with D.O.C. and PREA standards, which constitutes willful indifference to risk of and actual grievous bodily and mental harm, as evidenced by many extreme examples, such as: the refusal of top security staff to address my fear of sexual harassment and assault due to being forced to use inadequately private and safe showers in K-dorm until after I was forced to defend myself from such an attempt, and the similar refusal of confinement staff to house me separately from any male inmates despite my assertion that I was in fear of being housed with any, until after I was forced into such housing and again forced to defend myself. I absolutely require these treatments to survive; I am not capable of living with being denied them.

| 3-1-20 | V55036 |
|---|---|
| DATE | SIGNATURE OF GRIEVANT AND D.C. # |

***BY SIGNATURE, INMATE AGREES TO THE FOLLOWING # OF 30-DAY EXTENSIONS:**

0 / 1 / _____
# / Signature

**INSTRUCTIONS**

This form is used for filing a formal grievance at the institution or facility level as well as for filing appeals to the Office of the Secretary in accordance with Rule 33-103.006, Florida Administrative Code. When an appeal is made to the Secretary, a copy of the initial response to the grievance must be attached (except as stated below).

When the inmate feels that he may be adversely affected by the submission of a grievance at the institutional level because of the nature of the grievance, or is entitled by Chapter 33-103 to file a direct grievance he may address his grievance directly to the Secretary's Office. The grievance may be sealed in the envelope by the inmate and processed postage free through routine institutional channels. The inmate must indicate a valid reason for not initially bringing his grievance to the attention of the institution. If the inmate does not provide a valid reason or if the Secretary or his designated representative determines that the reason supplied is not adequate, the grievance will be returned to the inmate for processing at the institutional level pursuant to F.A.C. 33-103.007 (6)(d).

MAR 2 2020   Receipt for Appeals Being Forwarded to Central Office

Submitted by the inmate on: Wakulla Assistant Warden   Institutional Mailing Log #:_____

Program/Grievance

| DISTRIBUTION: | INSTITUTION/FACILITY | | (Received By) |
|---|---|---|---|
| | INMATE (2 Copies) | CENTRAL OFFICE | |
| | INMATE'S FILE | INMATE | |
| | INSTITUTIONAL GRIEVANCE FILE | INMATE'S FILE - INSTITUTION/FACILITY | |
| | | CENTRAL OFFICE INMATE FILE | |
| | | CENTRAL OFFICE GRIEVANCE FILE | |

DC1-303 (Effective 11/13)                 Incorporated by Reference in Rule 33-103.006, F.A.C.

LEGAL MAIL
Provided to Florida State Prison on     Nov 27th, 2020
12 | 20 for mailing by ///

Clerk of the Courts:

My apologies for this complaint being hand-written and likely out of proper format, but I currently have no access to a typewriter or computer to type it, nor even a stapler, and only extremely limited contact with any law library personnel.

Can you please send me the Local Rules of the District Court; forms for a Section 1983 pro se action; In Forma Pauperis forms; and forms for Appointment of Counsel?

Thank you!

Reign Kechane

P.S.  Can a typed copy of the complaint please be sent back to me? I am willing to pay whatever costs I can, including those incurred by such copying; I do not have a viable means to get any copy made at the institution at this time.

Ralph Leighton
DC# 435036
Florida State Prison
P.O. Box 800
Raiford, FL 32083




CHECKED DEC 04 2020

LEGAL MAIL

United States Federal Courthouse
111 North Adams Street
Tallahassee, FL 32301

CHF

LEGAL MAIL
Provided to Florida State Prison on
12/1/20 for mailing by